In re Martin Byrd **QUILLEN, Sr.,** Marlene C. **Quillen** dba/aka Quillen & Quillen **Accountants,** P.O. Box 145, Gate City, **Virginia 24251, Debtors.**

Martin Byrd **QUILLEN, Sr., Plaintiffs,**

v.

Richard E. **LYNG, Secretary of Agriculture, Defendant.**

Bankruptcy No. **7–86–00494–B.**
Adv. No. **7–87–0308.**

United States Bankruptcy Court,
W.D. Virginia,
Big Stone Gap Division.

Feb. 27, 1989.

Charles R. Allen, Jr., Roanoke, Va., for debtors/plaintiffs.

Jerry W. Kilgore, Asst. U.S. Atty., Roanoke, Va. and Bruce W. White, U.S. Dept. of Agriculture, Richmond, Va., for defendant.

## MEMORANDUM OPINION

H. CLYDE PEARSON, Chief Judge.

The issue before the court is whether the debtors are entitled to receive additional government monetary relief due to the destruction of their tobacco plant beds and tobacco crop following, and if so, how much.

On October 18, 1986, Congress enacted the Disaster Payment Program which authorized up to $400 million in disaster payments to eligible producers experiencing a loss in production because of drought, excessive heat, flood, hail, or excessive moisture. Public Law 99–500; 100 Stat. 1783–33. The program was only available to producers in designated counties who lost in excess of 50% of their income due to disasters in 1986 that damaged or de-

stroyed their 1986 crops.[1] Notice PA–1115, VA Notice PA–548(2)(A)(1)(a)–(c); VA Notice PA–532, No. 3 on page 1. The payment scale differs when applied to "program" and "nonprogram" crops.[2] The United States Department of Agriculture ("USDA") has designated tobacco a nonprogram crop. Notice PA–1115(5)(A).

Among the stated purposes of Notice PA–1115, issued on January 21, 1987, were the following: 1) To consolidate the information issued in previous Disaster Payment Program notices; and 2) to make obsolete some previously issued notices. One of the "Major Changes" contained within Notice PA–1115 was the determination of "disaster payment acreage" for all nonprogram crops. Section (5)(D) was amended to remove the requirement that 1986 disaster acreage for nonprogram crops be limited to the 1985 acreage of the crop. As a result of this modification, a producer's disaster payment acreage would be the sum of the 1986 planted acreage plus the 1986 approved planted acreage. Notice PA–1115(5)(D). A memorandum issued on January 28, 1987, however, entitled "Disaster Payment Acreage for Burley Tobacco—Clarification of Notice PA–1115, Paragraph 5D" stated:

> When computing the disaster payment acreage for burley tobacco, the total disaster payment acreage for a farm shall be limited to the farm's effective quota divided by the farm's yield.

Martin Byrd Quillen, Sr., and his wife Marlene C. Quillen ("debtors") filed a Chapter 11 petition in this court on April 3, 1986. On December 15, 1986, debtors filed an application with the USDA pursuant to P.L. 99–500 for damages to their 1986 tobacco crop. Debtors presented their claim before the Scott County, Virginia, Agricultural Stabilization and Conservation Committee ("County Committee") on February 4, 1987. At the hearing, debtors sought to recover disaster payments on 7.7 acres of tobacco. Debtors asserted that they had planted only 1.2 acres of tobacco in the field, but sought additional prevented planting credit on 6.5 acres that they were prevented from planting because dry weather had destroyed the tobacco plants in their plant beds.[3] After the hearing, the County Committee concluded that under the Disaster Payment Program, debtors were only entitled to relief on 1.2 acres. The Committee determined that the shortage of tobacco plants was generally attributable to freeze damage and not dry weather and that debtors were not entitled under the Program to relief on the 6.5 additional acres as they had requested. Debtors were subsequently notified of the Committee's decision.

Debtors, under the appellate process, appealed the County Committee's decision to the Virginia State ASC Committee ("State Committee"), which reviewed the matter on April 22, 1987. The State Committee determined that since prevented planting only applies to the planting of crops in the field and not to the failure of plants in plant beds, debtors were limited to disaster payments on the 1.2 acres they had planted in the field. The State Committee did not address the County Committee's concern with freeze damage but, instead, considered the issue moot.

The matter comes before the court pursuant to 11 U.S.C. § 542(b) and 11 U.S.C. § 543(c) seeking turnover of funds to the estate.

The court must first decide whether tobacco plants destroyed in plant beds qualifies a producer for prevented planting credit. If it does, the court must then determine the amount of credit the producer is to receive.

1. Another requirement of the Disaster Payment Program was to sow a conserving crop on the approved prevented planting acreage. Notice PA–1115, VA Notice–548(2)(A)(3).

2. "Program" crops qualify on a per farm basis, while "nonprogram" crops qualify on a per county basis. Notice PA–1101, VA Notice PA–537(1).

3. Tobacco is a transplanting crop and plants are first grown in a plant bed before being later transplanted to the field.

The debtor testified without any substantial contradiction that his tobacco beds were destroyed by drought and that he attempted and made every effort to find other tobacco plants to replace those destroyed but to no avail. He was unable to purchase from other farmers replacement plants for resetting in his fields. Therefore, the essential question here is whether or not his destroyed beds come within the agricultural program at issue.

Based on the evidence presented, there was no designation that plants destroyed in plant beds did not constitute prevented planting. In the written record of February 4, 1987, the County Committee declared that prevented planting credit was not applicable to tobacco. The Committee attributed the failure of debtors' plant beds to freeze damage, a disaster not covered by the Disaster Payment Program, and denied debtors' claim. This premise was abandoned by the State Committee. There was no mention made of plant bed failure not being covered under the Disaster Payment Program.

At trial, Malan K. Rudy, State Executive Director for the Virginia State ASCS Committee, testified as follows:

A. "Prevented planting" as far as A.S.C.S. is concerned and the regulations are concerned over the years, it has been where a person has purchased fertilize and seed beds preparation, seeds, whatever and prevent that. . . . and can present all of that evidence to the State Committee or the County Committee, wherever the appeal may be held, and justify or prove that the person did really prepare to plant that many acres as indicated.

"Prevented planting" is in all of our crops, such as peanuts, tobacco, corn across the State of Virginia. *It is nothing new as far as tobacco is concerned.* (emphasis added)

Q. And what is your rule as far as—. Where does it have to be planted?

A. It has to be planted in the fields. And, of course, a tobacco plant bed was never considered as one of those things

that is covered by the Disaster Payment Program.

Q. And what are you basing that opinion on?

A. I am basing that opinion upon the fact that it has to be put into the field in order to collect the Disaster payment on it.

Q. And where did you obtain that information?

A. That is in the notices and the regulations for the U.S.D.A.

Q. Do you know which notice it is in, or regulation?

A. No, sir, I do not at the present time.

When cross-examined by debtors' counsel, Mr. Rudy continued:

Q. Mr. Rudy, you said that "prevented planting" does not include a situation where you have plants or have planted a seed bed and then those plants are damaged as a result of a particular disaster before they are transplanted into the field, is that correct?

A. Yes, sir.

Q. But you say that you cannot recall what notices or regulations promulgated by the United States Department of Agriculture covered that particular type of disaster, is that correct?

A. Yes, sir, I have them. They are P.A. 1155, I believe. And I have a lot of notices. It is hard to remember. I can't remember but they are in the file.

Q. You can't remember?

A. No.

Q. Are you familiar with the documents that were transmitted by Mr. Kilgore to the Court and myself?

A. Yes, sir.

Q. —pursuant to a motion for production of documents?

A. Yes, sir.

Q. Is that particular issue covered in those particular documents?

A. "Prevented planting"?

Q. Yes, sir?

A. Yes, sir.

Q. Is there anything in those particular documents that says that "prevented planting" does not cover the situation where the seeds were planted in a seed bed for later transplanting into a field?

A. No, sir.

Although the notices issued by the USDA with regard to the Disaster Payment Program are at times confusing and ambiguous, the court, after thorough review, finds no evidence that plant bed failure is to be excluded when determining prevented planting acreage. The USDA is well aware that tobacco, unlike most other crops, is a transplanting crop requiring plants first be grown in a plant bed before being transplanted to the field. In light of Mr. Rudy's testimony that "prevented planting . . . is nothing new as far as tobacco is concerned," the court concludes that if the USDA desired to exclude tobacco plants destroyed in their beds before they were transplanted to the field from the determination of what constitutes prevented planting, they could have explicitly set forth such an exclusion in the regulations or notices. "The law is that the conclusion of the head of an executive department on such a question will not be reviewed by the courts, where it is fairly arrived at with substantial evidence to support it." *Houston v. St. Louis Independent Packing Co.*, 249 U.S. 479, 484, 39 S.Ct. 332, 334, 63 L.Ed. 717, 720 (1919). There is no evidence before the court, however, to support the government's assertion that destroyed plant beds should be excluded when calculating prevented planting acreage. An administrative officer or board authorized to prescribe rules and regulations for the administration of a statute has no power to promulgate a regulation which creates a rule out of harmony with the statute. *Miller v. United States*, 294 U.S. 435, 439, 55 S.Ct. 440, 441, 79 L.Ed. 977, 981 (1935).

If a producer's plant bed is destroyed and plants for resetting in the field are unavailable at the time when the setting season is upon such producer, then he has been prevented from planting just as effectively as a crop which, like corn for example, is planted directly by placing the seed initially in the field.

Therefore, the court finds that based on the evidence, prevented planting should include debtors' destroyed plant beds.

In light of this finding, the court must now determine the amount of disaster payment acreage debtors are entitled to receive.

The memorandum of January 28, 1987, setting forth the formula for determining disaster payment acreage for burley tobacco, was issued before debtors presented their claim to the County Committee on February 4, 1987. The memo's sole purpose was to alter provision (5)(D) of Notice PA–1115. The memo stated that the total disaster acreage for a farm was to be limited to the farm's effective quota divided by the farm's yield. Using the farm's 1986 quota of 8,645 lbs. (see Plaintiff's Exhibit "D") divided by the farm's yield of 2,776 lbs., the farm's total disaster acreage amounts to 3.114 acres. Based on this amount, counsel for the parties and the appropriate committee will compute the disaster payment which debtors are entitled to receive and tender an order to the court within twenty (20) days providing for disbursement of the same.

An Order will be entered.

The Clerk shall certify a copy of this Memorandum Opinion to the debtors; Charles R. Allen, Jr., Esq., counsel for debtors/plaintiffs; Jerry W. Kilgore, Esq., Asst. U.S. Attorney; Bruce W. White, Esq., U.S. Department of Agriculture; members of Creditors' Committee; and U.S. Trustee.